SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Henry W. LORIN, Eugene K. Laff, Stanley Aslanian, Jr., Capital Shares, Inc., Lawrence Caito, Toni Vallen, Rosario Russell Ruggiero, Enn Kunnapas, Paul L. Miano, and Edward J. Barter, Defendants.

No. 90 Civ. 7461 (HB).

United States District Court,
S.D. New York.

Nov. 21, 1994.

Thomas V. Sjoblom, Washington, DC, for plaintiff S.E.C.

Paul K. Rooney, New York City, for defendants Capital Shares, Inc. and Lawrence Caito.

Defendant Eugene K. Laff, pro se.

## OPINION AND ORDER

BAER, District Judge.

On November 20, 1990, the Securities and Exchange Commission ("SEC") brought this civil injunctive action pursuant to section 20(b) of the Securities' Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(b) (1988), and section 21(d) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d) (Supp.1993). The complaint alleges, in relevant part, that defendants Capital Shares, Inc. ("Capital Shares"), Lawrence Caito ("Caito"), the owner, president and head trader of Capital Shares, and Eugene K. Laff ("Laff") had engaged in manipulative schemes in violation of various securities laws. This case had initially been assigned to the Honorable Pierre N. Leval, but was later transferred to me.

The SEC has made two motions. The first seeks to dismiss with prejudice all remaining claims against Laff pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure, while the second requests that the affirmative defense of defendants Caito and Capital Shares that asserts a limitation period be struck pursuant to Rule 12(f) of the Rules.

I. *SEC's Motion to Dismiss Remaining Claims Against Laff*

██ In a March 15, 1993 order, Judge Leval granted partial summary judgment in favor of the SEC and against defendant Eugene K. Laff ("Laff") on the basis of Laff's prior criminal conviction on allegations that constitute, in part, the allegations in the instant case. *SEC v. Lorin,* No. 90 Civ 7461, 1993 WL 77372 (S.D.N.Y. Mar. 15, 1993). In so doing, Judge Leval granted the SEC virtually all of the injunctive relief it sought against Laff. The only relief the SEC can further obtain against Laff is an injunction almost identical to the one previously issued and approximately $192,000 in disgorgement. The SEC believes, however, that even if it obtains a favorable judgement, Laff will be unable to pay the disgorgement. SEC Memorandum at 3. Laff has been incarcerated for the last three years and will not be released for at least another year as a result of his conviction. In addition, Laff has reportedly depleted most of his assets in financing his criminal defense, while the remainder of his assets have apparently been attached due to the numerous civil judgements obtained against him as a result of his participation in the activity that supported his conviction. *Id.* at 3–4. The SEC feels that proving the remaining claims against Laff would involve a substantial commitment of time and resources by both the parties and the court that would not be worth the small amount of additional relief the SEC might thereby acquire. *Id.* at 4. Consequently, the SEC moved pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure to dismiss with prejudice all remaining claims against Laff, namely those that did not constitute the activity for which he was convicted. Specifically, the SEC seeks dismissal of the Third and Sixth causes of action against Laff, Complaint ¶¶ 147–49, 160–70, in their entirety, and the First, Second, Fourth and Seventh causes of action against Laff as far as these claims relate to all transactions in Big O Tires, Inc., Cliff Engle Ltd., Digital Metcom, Inc., Fountain Powerboat Industries, Inc. and Tunex International, Inc., to transactions in Flores de New Mexico, Inc. prior to August 27, 1986, and to transactions in TS Industries, Inc. prior to July 1, 1987, Complaint ¶¶ 27–146, 150–55, 171–80.

Rule 41(a)(2) provides that, except where parties agree to a stipulation of dismissal,[1] "an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." Fed.R.Civ.Pro. 41(a)(2). The second sentence of Rule 41(a)(2) provides that "[i]f a counterclaim has been pleaded by a defendant[,] . . . the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court." *Id.* Although Laff did file counterclaims against the SEC, these counterclaims were dismissed in an order of Judge Leval's dated July 30, 1991. *SEC v. Lorin,* No. 90 Civ. 7461, 1991 WL 155767 (S.D.N.Y. Aug. 7, 1991). With no counterclaims pending before the court and with no objection lodged by Laff, Rule 41(a)(2) can be used to dismiss the remaining actions against Laff. *See Banque de Depots v. National Bank of Detroit,* 491 F.2d 753, 757 (6th Cir. 1974).

This, however, does not end the court's inquiry. As explained by the Southern District of New York, "Under Rule 41(a)(2) '[t]he essential question is whether the dismissal of the action will be unduly prejudicial to the defendants; if so, plaintiffs' motion should be denied. If not, it should be granted. . . .' This rationale applies even when . . . the plaintiff seeks a dismissal *with prejudice* . . . ." *Wainwright Secs. Inc. v. Wall St. Transcript Corp.,* 80 F.R.D. 103, 105 (S.D.N.Y.1978) (alteration in original) (quoting *Harvey Aluminum, Inc. v. American Cyanamid Co.,* 15 F.R.D. 14, 18 (S.D.N.Y. 1953)). "A voluntary dismissal may, at the discretion of the trial court, be granted if prejudice will not result to the other party." *SEC v. American Bd. of Trade,* 750 F.Supp. 100, 105 (S.D.N.Y.1990) (citing *Kern v. TXO Prod. Corp.,* 738 F.2d 968, 970 (8th Cir. 1984)). As in *American Board of Trade,* the defendant here has made no opposition to the

motion, and it is difficult to understand how dismissal with prejudice will adversely affect him. I therefore grant the SEC's motion to dismiss all remaining claims against Laff with prejudice, as identified above.

## II. *SEC's Motion to Strike Affirmative Defense Asserting a Limitation Period*

### A. *Background*

The SEC alleges that between March and October 1987, Caito, on behalf of Capital Shares, had purchased securities of five corporations in order to reduce the "floating supply" of stock in return for guaranteed profit, entered and changed bid quotations on the National Association of Securities Dealers Automated Quotation system that were not justified by legitimate supply and demand for the securities, and failed to disclose material information about the above stated actions and the fact that the prices of the stocks were manipulated by such conduct. The SEC contends that Capital Shares' and Caito's (collectively, "defendants") conduct violated section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) (1988), sections 9(a)(2), 10(b), 15(c)(1)–(2), and 17(a)(1) of the Exchange Act, 15 U.S.C. §§ 78i(a)(2), 78j(b), 78o(c)(1)–(2), and 78q(a)(1) (1988), and SEC Rules 10b–5, 15c1–2, 15c2–7, 17a–3 and 17a–4 promulgated thereunder, 17 C.F.R. §§ 240.10b–5, 240.15c1–2, 240.15c2–7, 240.17a–3, and 240.17a–4 (1994).

The SEC seeks a permanent injunction prohibiting the defendants from violating the above securities laws and an order directing the defendants to disgorge all money, property and other assets derived from the transactions at issue. The defendants assert the affirmative defense that the SEC's action is "time barred." Defendants' Supplemental Memorandum at 1.[2] They claim the limitation period applicable to private rights of action under the federal securities laws, com-

---

1. Under Rule 41(a)(1), a plaintiff can voluntarily dismiss an action without order of the court by filing either a notice of dismissal before the defendant files an answer, or a stipulation of dismissal signed by all parties. The defendant has already filed his answer, and the SEC contends that Laff's incarceration has made it difficult to obtain a signed stipulation; consequently, the SEC moves pursuant to Rule 41(a)(2).

2. Because Judge Leval deferred decision on the limitation issue in 1991, as noted below, which was over three years ago, the parties were each provided the opportunity to submit an additional memorandum.

monly referred to as Rule 10b–5 actions, bars this SEC action. In February 1991, the SEC moved to strike this affirmative defense pursuant to Rule 12(f) of the Federal Rule of Civil Procedure, but Judge Leval deferred decision on this issue in his June 18, 1991 order. *SEC v. Lorin*, No. 90 Civ. 7461, 1991 WL 576895 (S.D.N.Y. June 18, 1991).

■■■ Rule 12(f) allows the Court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R.Civ.Pro. 12(f). The Federal Rules of Civil Procedure reflect the policy that pleadings should be treated liberally, and that a party should have the opportunity to support its contentions at trial. *Oliner v. McBride's Indus., Inc.*, 106 F.R.D. 14 (S.D.N.Y.1985). Accordingly, Rule 12(f) motions are not favored and will not be granted routinely. *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F.Supp. 832 (S.D.N.Y.1988). To succeed on such a motion, the movant must first show that it is prejudiced by the inclusion of the defense. *Shell Oil Co. v. EEOC*, 523 F.Supp. 79, 83 (E.D.Mo.1981). Furthermore, there can be no questions of fact or law which, if resolved in favor of the adversary, would enable the defense to succeed. *Resolution Trust Corp. v. Youngblood*, 807 F.Supp. 765, 769 (N.D.Ga.1992); *Shell Oil*, 523 F.Supp. at 83; *Soanes v. Baltimore & O.R.R.*, 89 F.R.D. 430, 431 n. 1 (E.D.N.Y. 1981). If the SEC is correct in that, as a matter of law, no limitation period applies to this action, then in accordance with these precedents, this affirmative defense should be stricken, because there would remain no question of fact that would allow the defense to succeed and the SEC would otherwise be prejudiced by the additional time it would spend and expense it would incur in arguing the issue at trial.

B. *Discussion*

■■■ Plaintiff SEC contends that no limitation period applies to civil enforcement actions brought pursuant to the Securities Act and the Exchange Act, such as the one brought here, while defendants allege that such actions are subject to the one-year/ three-year limitation period that applies to certain actions brought by private parties under the Exchange Act.[3] The United States Court of Appeals for the Ninth Circuit, in *SEC v. Rind*, 991 F.2d 1486 (9th Cir.) ("*Rind*"), cert. denied, —— U.S. ——, 114 S.Ct. 439, 126 L.Ed.2d 372 (1993), is the first, and only, Circuit to adjudicate the issue. *Rind* found that no limitation period applied to the type of SEC actions at issue in this case. In so ruling, the Ninth Circuit agreed with all District Courts that had previously addressed the question, *see SEC v. Toomey*, 866 F.Supp. 719 (S.D.N.Y.1992); *SEC v. Keating*, [1992 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 96,906, 1992 WL 207918 (C.D.Cal. July 21, 1992); *SEC v. O'Hagan*, 793 F.Supp. 218 (D.Minn.1992); *SEC v. Hayes*, 1991 WL 236846, 1991 U.S.Dist. LEXIS 19859 (N.D.Tex. July 25, 1991), aff'd, 5 F.3d 1494 (5th Cir.1993); *SEC v. Willis*, 777 F.Supp. 1165 (S.D.N.Y.1991); *SEC v. Washington County Util. Dist.*, [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,112, Civ. No. 2–77–15, 1982 WL 1381 (E.D.Tenn. Dec. 2, 1982); *SEC v. Glick*, [1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,535, 1980 WL 1414 (D.Nev. June 12, 1980); *SEC v. Penn Cent. Co.*, 425 F.Supp. 593 (E.D.Pa.1976), including the Central District of California, whose ruling the Ninth Circuit affirmed, *SEC v. Rind*, [1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,168, at 90,922–23, 1991 WL 283840 (C.D.Cal. July 29, 1991). Nonetheless, by denying a writ of *certiorari* in *Rind* the Supreme Court left the issue an arguable matter in all Circuits except the Ninth.[4] Moreover, the *Rind* decision has since been criticized extensively in the literature, as noted below. The ensuing discussion is intended not only to explain my reasons for granting the SEC's motion in this case, but perhaps more importantly to provide in some

---

**3.** *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

**4.** Courts deciding the matter since *Rind* have similarly found that no limitation period applies. *SEC v. Downe*, No. 92 Civ. 4092, 1994 WL 67826 (S.D.N.Y. Mar. 3, 1994) (citing *Rind*); *SEC v. Antar*, 831 F.Supp. 380 (D.N.J.1993).

detail an analysis aimed at a resolution of the remaining questions that understandably continue to engender criticism of the *Rind* decision.

SEC civil enforcement actions that seek either or both injunctions and disgorgement are brought pursuant to the Congressional authority granted by section 20(b) of the Securities Act and section 21(d) of the Exchange Act. Section 20(b) provides that whenever "any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of [the securities laws], the Commission may ... bring an action ... to enjoin such acts or practices." 15 U.S.C. § 77t(b) (1988). Section 21(d) contains similarly-worded authority. 15 U.S.C. § 78u(d) (Supp.1993). The statutes do not state whether a limitation period applies. While Congress can affirmatively state that no limitation period applies to a given federal claim, *Anderson v. United States Atomic Energy Comm'n,* 313 F.2d 313, 316 (7th Cir.1963) ("Congress may create a right without a time limitation in which it must be exercised." (citation omitted)); *see, e.g.,* 26 U.S.C. § 6501(c) (providing that where a taxpayer files a false income tax return or no income tax return, or wilfully attempts to evade certain taxes, the United States may assess the tax or begin a "proceeding in court for the collection of such tax ... *at any time* " (emphasis added)); *see also Chase Secs. Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945) (stating that because the "shelter" of limitation periods is not a fundamental right, they are "good only by legislative grace and ... subject to a relatively large degree of legislative control"), where Congress has been silent concerning a limitation period, courts usually create one by "borrowing" a period from another statute, *Reed v. United Transp. Union,* 488 U.S. 319, 323–24, 109 S.Ct. 621, 624–25, 102 L.Ed.2d 665 (1989).

**1.** *"Catch–All" Statute of Limitations, 28 U.S.C. § 2462*

■ There would be no need to consider "borrowing" a limitation period, whether from a different statute, or from a different section of the statutes at issue, if I determine that SEC actions seeking disgorgement are encompassed by the federal "catch-all" statute that provides a five-year limitation period, wherever Congress has been silent, for actions that seek to "enforce[ ] ... any civil fine, penalty, or forfeiture." 28 U.S.C. § 2462 (1988). Although it appears that no court has yet addressed the issue, at least not in a reported decision,[5] numerous legal commentators have recently asserted the statute's applicability in the wake of the *Rind* decision. Jonathan Eisenberg & Benjamin Haskin, *Securities Enforcement: Statute of Limitations Made Applicable to SEC Actions,* 8 No. 7 Insights 4 (P–H July 1994) ("Strong arguments also can be made that disgorgement is a 'civil fine, penalty, or forfeiture.' "); Richard L. Stone & Aron Jaroslawicz, *Statute of Limitations on Actions Brought by SEC,* N.Y.L.J., Oct. 24, 1994, at 1 (concluding that section 2462 "applies to SEC-initiated federal suits"); Edward Brodsky, *Statute of Limitations and Civil Enforcement,* N.Y.L.J., Sept. 21, 1993, at 3, 6 ("Congress has expressly provided an all-encompassing statute of limitations that should control."). This determination would appear to turn on whether disgorgement constitutes a "fine, penalty, or forfeiture."[6] As

**5.** In *SEC v. Glick,* [1980 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 97,535, 1980 WL 1414 (D.Nev. June 12, 1980), the District of Nevada ruled that 28 U.S.C. § 2462 does not apply to SEC actions seeking injunctions.

**6.** An argument could be made that SEC actions seeking disgorgement do not constitute an action for "the enforcement[,]" 28 U.S.C. § 2462 (1988), of a fine, penalty, or forfeiture in that the obligation to pay the disgorged amount does not even exist until the SEC action is successful. This argument in a different context was recently rejected by the District of Columbia Circuit in

*3M Co. v. Browner,* 17 F.3d 1453 (D.C.Cir.1994). The court pointed out that, according to the Reviser's Notes, the changes made to the predecessor statute to 28 U.S.C. § 2462, which included a change from "suit or prosecution for any penalty or forfeiture" to the current "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture" were noted as merely being changes in phraseology. *Id.* at 1458 (citing H.R.Rep. No. 308, 80th Cong., 1st Sess. A191 (1947)). The court therefore held that such a change could not be treated as substantive, and noted that the existing statute's "application to

indicated by the Supreme Court's interpretation of the statute below, however, the label placed on a monetary liability—whether, for example, "fine," "penalty," "sanction," or "disgorgement"—is not dispositive; instead, the determining consideration concerns whether the amount so labelled serves a remedial or punitive function.[7] *Cf. United States v. Halper,* 490 U.S. 435, 448, 109 S.Ct. 1892, 1901–02, 104 L.Ed.2d 487 (1989) (stating that determining whether a civil fine constitutes punishment in the context of the Double Jeopardy Clause "requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve").

I will not label disgorgement a "fine, penalty, or forfeiture" in light of the operation of disgorgement, which merely deprives one of wrongfully obtained proceeds. *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1308 (2d Cir.) ("Restitution of the profits on these transactions merely deprives the appellants of the gains of their wrongful conduct."), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 562, 30 L.Ed.2d 558 (1971). As such, disgorgement merely returns the wrongdoer to the status quo before any wrongdoing had occurred. Similarly, Rule 10b–5 actions, which are the actions brought by private parties who have been injured by another's violation of the securities laws, return plaintiffs to the status quo before any securities laws had been violated. In contrast, fines, penalties, and forfeitures alter the status quo before the unlawful activity took place. A simple example demonstrates this difference. An individual who stole an item might be required to return the item, serve time in jail, and pay an amount of money to the government. Returning the item puts the individual where he or she would have been had he or she not stolen the item, and is therefore similar to disgorgement. Simultaneously, the victim of the theft is generally returned to where he or she would have been had the theft not occurred. Serving time in jail and paying money to the government, meanwhile, do not serve the purpose of returning the affected parties to the status quo, and therefore serve the purpose of fines, penalties, and forfeitures.

This distinction is implicit in the Supreme Court's *Meeker v. Lehigh Valley R.R.,* 236

cases in which the court first adjudicates liability and then sets the penalty or fine is unquestioned." *Id.* (citations omitted). Reasoning that "if [the government] is right, then there would be no limitations period and liability might be imposed no matter how distant the violation," *id.* at 1457, the court concluded that "[i]n view of the history of [the statute] and reasons why we have statutes of limitations, such a result is inconceivable," *id.* at 1459.

*Browner* criticized the Second Circuit's decision in *Capozzi v. United States,* 980 F.2d 872 (2d Cir.1992), which held that "assessments" of certain penalties made by the Internal Revenue Service ("IRS") are not subject to the limitation period of the "catch-all" statute. *Capozzi* involved an assessment made by the IRS in accordance with its statutory authority, which involves the calculation of the penalty by the IRS and an official recordation of that amount. This procedure is conducted by the IRS *ex parte,* as the taxpayer is provided no notice of an impending assessment. The IRS can then bring an action to collect the amount found owing if it is not paid. *Capozzi* relied on certain distinctions contained in the Internal Revenue Code and the fact that assessments are done *ex parte* in finding that an assessment of a penalty does not constitute an "action, suit, or proceeding," as required by the "catch-all" statute. *Capozzi* further stated that, in any event, an assessment is not a procedure taken for the *enforcement* of a penalty, because "[n]o legal liability exists until the IRS assesses the penalty[,] [and] [t]herefore, there is nothing to enforce until after the assessment is made." *Id.* at 875. By contrast, noted *Capozzi,* any subsequent action to collect any unpaid amount constitutes an action for the *enforcement* of a penalty.

Whether or not the Second Circuit intended that *Capozzi* be restricted to its unique circumstances concerning the detailed steps provided in the Internal Revenue Code for the assessment and collection of IRS penalties is something I need not address, as I rely on other grounds in finding below that SEC actions seeking disgorgement are not subject to the "catch-all" statute.

7. I therefore do not find persuasive the statement in *Tull v. United States,* 481 U.S. 412, 424, 107 S.Ct. 1831, 1839, 95 L.Ed.2d 365 (1987), that disgorgement is "a more limited form of penalty than a civil fine." There, the Court was not concerned with making careful distinctions between fines, penalties, and disgorgement, the matter at issue in the instant case, but instead was considering only whether a civil fine constitutes an equitable or a legal remedy. *See also* 36 Am.Jur.2d *Forfeiture and Penalties* § 3 (1968) (stating that the terms "fine," "penalty," and "forfeiture" "are often used loosely and confusedly").

U.S. 412, 35 S.Ct. 328, 59 L.Ed. 644 (1915), decision, where the Court addressed a dispute concerning the predecessor statute to the existing "catch-all" statute. The case involved a claim pursuant to section 16 of the Interstate Commerce Act, which authorized private parties to recover the damages they sustained as a result of unreasonable rates and unjust discrimination perpetrated by private parties in the provision of transportation services. The Court found that the action was not subject to the limitation period in the statute, which referred to suits seeking a "penalty or forfeiture," [8] because those terms "refer to something imposed in a punitive way for an infraction of a public law, and do not include a liability imposed solely for the purpose of redressing a private injury, even though the wrongful act be a public offense and punishable as such." *Id.* at 423, 35 S.Ct. at 332. *Meeker* makes clear that the damages sought in Rule 10b–5 actions do not constitute a fine, penalty, or forfeiture. SEC actions seeking disgorgement differ slightly from 10b–5 actions in that they do not attempt to redress a private injury, but rather aim to separate the securities law violator from his or her unlawfully obtained profits. Consequently, the amount sought in the two types of actions can diverge in that the wrongdoer's profits will not necessarily equal the victim's losses.[9] *E.g., Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 734 F.Supp. 1071, 1075 (S.D.N.Y.1990). *Meeker,* however, allows for the conclusion that disgorgement does not constitute a fine, penalty, or forfeiture by explaining that "strictly remedial" liabilities do not fall under the "catch-all" statute because they are not "punitive." *Meeker,* 236 U.S. at 423, 35 S.Ct. at 332. As discussed above, disgorgement is similar to the redressing of a private injury in that both serve to return affected parties to the status quo before the unlawful activity

at issue had taken place. That goal appears, by definition, to be remedial. *See also SEC v. Bilzerian,* 29 F.3d 689, 696 (D.C.Cir.1994) (holding that disgorgement does not constitute punishment for the purposes of the Double Jeopardy Clause because "the disgorgement order did not ask [defendant] to give up anything in excess of the amount of his illicit gains"), *aff'g* 814 F.Supp. 116 (D.D.C.1993); *SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir. 1978) (holding that "[d]isgorgement is remedial and not punitive"); *SEC v. E & H Oil Co.,* No. 75 Civ. 0638, 1980 WL 1444, *3 (W.D.La. Sept. 26, 1980) (holding that "disgorgement is remedial in nature"). Moreover, that merely requiring one to "give back" wrongfully obtained proceeds is not punitive is made evident by contrasting it against statutes that do indubitably levy liabilities that are punitive. The Insider Trading Sanctions Act, for example, authorizes the SEC to pursue a monetary liability against those engaging in insider trading activity of up to three times the profit gained (or loss avoided). 15 U.S.C. § 78u–1(a)(2) (1988). Those payments are punitive—and not remedial—because they are amounts not limited to either the damage caused by the wrongdoer or the proceeds he or she wrongfully obtained. *Cf. United States v. Halper,* 490 U.S. 435, 449, 109 S.Ct. 1892, 1902, 104 L.Ed.2d 487 (1989) (ruling that "where a fixed-penalty provision subjects a[n] . . . offender to a sanction overwhelmingly disproportionate to the damages he has caused[,]" the penalty constitutes punishment for the purposes of the Double Jeopardy Clause).

By refusing to subject securities law violators to liability both to the SEC for disgorgement and private parties for the recovery of damages, courts have ensured that disgorgement serves as a remedial, and not as a

---

**8.** As discussed *supra* note 6, according to the Reviser's Notes, the changes made to the statute, one of which resulted in the statute now reading "fine, penalty, or forfeiture," were merely changes in phraseology. H.R.Rep. No. 308, 80th Cong., 1st Sess. A191 (1947). The District of Columbia Circuit, while applying the current form of the statute, noted that the change in phraseology could not be construed as a change in substance. *3M v. Browner,* 17 F.3d 1453, 1458 (D.C.Cir.1994).

**9.** The SEC relies on this difference while arguing that its actions are free from limitation periods, due to the fact that they, unlike Rule 10b–5 actions, are supposedly brought to vindicate a public interest. This issue is addressed in the section "Limitation Period Inappropriate Where Government Is Pursuing A Public Right." *Infra* p. 1127.

punitive, measure.[10] *E.g., SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir.) (terming disgorgement "remedial relief" while rejecting the contention that disgorgement constituted a "penalty assessment," by noting that the [defendants] are protected "against double liability [in that] any private judgments against these [defendants] arising out of the events of this case are to be paid from" the amount disgorged to the SEC), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 562, 30 L.Ed.2d 558 (1971); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F.Supp. 1071, 1076 (S.D.N.Y.1990) (explaining that a securities law violator will not be subject to liability to both the SEC and private parties because such liability would be "clearly punitive in its effect and would constitute an impermissible penalty assessment"). Courts have limited the amount disgorged in a number of other ways, thereby further preventing disgorgement from assuming punitive traits. *E.g., SEC v. UNIOIL*, 951 F.2d 1304, 1306 (D.C.Cir.1991) ("[T]he court may exercise its equitable power only over property causally related to the wrongdoing ... [because] disgorgement may not be used punitively. Therefore, the SEC generally must distinguish between legally and illegally obtained profits."); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104–05 (2d Cir. 1972) (stating that in addition to ordering disgorgement of proceeds, it would order interest at the legal rate in effect in the state as opposed to the profit earned on the proceeds, because ordering disgorgement of the profit earned on the proceeds would constitute a "penalty assessment"); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F.Supp. 1071, 1077 (S.D.N.Y.1990) (permitting violators to deduct the expenses they incurred in obtaining their proceeds from the amount of those proceeds, because failing to so permit would "constitute[ ] a penalty assessment and go[ ] beyond the restitutionary purpose of the disgorgement doctrine").

The decision of the Bankruptcy Court for the Southern District of Florida in *SEC v. Telsey*, 144 B.R. 563 (Bankr.S.D.Fla.1992) would appear to be at odds with my finding that disgorgement is not subject to 28 U.S.C. § 2462 (1988), but can actually be easily reconciled with my decision. In *Telsey*, the SEC contended, and the court agreed, that disgorgement[11] sought by the SEC constituted a "fine, penalty, or forfeiture" so as to except the amount owed by the defendant from discharge under the Bankruptcy Code. *Id.* at 564. The inquiry in which the *Telsey* court engaged to make its ruling, however, was not the "punitive v. remedial" analysis that the Supreme Court provided in *Meeker v. Lehigh Valley R.R.*, 236 U.S. 412, 35 S.Ct. 328, 59 L.Ed. 644 (1915), for the purpose of ascertaining whether a liability constitutes a "fine, penalty, or forfeiture" under 28 U.S.C. § 2462; instead, the *Telsey* court appropriately referred to other authority, because it was, as it pointed out, investigating whether a debt constitutes "a 'fine, penalty, or forfeiture' *within the meaning of [section] 523(a)(7)* " of the Bankruptcy Code. *Telsey*, 144 B.R. at 565 (emphasis added). That authority led the *Telsey* court to classify the disgorgement as "a fine, penalty, or forfeiture" on the basis of Telsey's not being "an 'honest but unfortunate debtor.' " *Telsey*, 144 B.R. at 565 (quoting *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (in turn quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934))).

The *Telsey* court further acknowledged that its holding was not based on strict statutory construction, but rather "comport[ed] with its sense of equity [and] the object and

---

10. While the fact that courts preclude securities law violators from liability to both the SEC and private parties buttresses the claim that disgorgement does not constitute a fine, penalty, or forfeiture, it weakens the SEC's claim that its actions do not substitute for Rule 10b–5 actions, which it alleges in contending that its actions operate to vindicate a public right. This issue is discussed in the section "Limitation Period Inappropriate Where Government Is Pursuing A Public Right." *Infra* p. 1127.

11. The disgorgement at issue in *Telsey* concerned money that the defendant had obtained in violation of an SEC order that barred him from associating with "any broker, dealer, registered investment advisor or registered investment company." *Telsey*, 144 B.R. at 564. Although this differs from the disgorgement sought in the instant case, the difference is not relevant to my findings.

policy of [section] 523(a)(7)." *Telsey,* 144 B.R. at 565. This, analysis, the *Telsey* court explained, it is authorized to do pursuant to the Supreme Court's *Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 357, 93 L.Ed.2d 216 (1986), decision, which states that in the context of section 523 of the Bankruptcy Code, courts should not be restricted by the words of the statute, but should instead examine the statute's object and policy. Those considerations simply differ from the ones discussed in *Meeker.* *Telsey,* furthermore, might simply reflect the concept recognized by the Supreme Court in *United States v. Halper,* 490 U.S. 435, 447 n. 7, 109 S.Ct. 1892, 1901 n. 7, 104 L.Ed.2d 487 (1989), that, "for the defendant even remedial sanctions carry the sting of punishment." Consequently, *Telsey* cannot suggest that the disgorgement sought by the SEC constitutes a "fine, penalty, or forfeiture" under 28 U.S.C. § 2462 (1988). Let me now turn to whether a limitation period on the type of SEC actions at issue in this case should be "borrowed," either from another statute or from different provisions of the two statutes at issue.

### 2. *"Borrowing" a Limitation Period*

The SEC contends that courts should not borrow a limitation period here because Congress' failure to specify a limitation period indicates its intent that no limitation period apply. SEC Supplemental Memorandum at 1, n. 3 (terming Congress' failure to provide a limitation period "deliberate"). Defendants, on the other hand, point out that the provisions authorizing injunctions do not on their face appear to provide for injunctive relief based on *past* violations of the relevant securities laws, which are the type of violations alleged in the instant case, let alone disgorgement of the profits derived from past violations. Consequently, they may argue, Congress failed to supply a limitation period only because it never provided the SEC with the authority to pursue the type of civil enforcement actions it does here and, therefore, never considered the need to limit the time within which they could be brought.[12]

The defendant in *Rind* apparently relied on this argument, urging the Ninth Circuit to adopt a limitation period for SEC enforcement actions in the same manner that the Supreme Court had done in connection with Rule 10b–5 actions in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). *Rind,* 991 F.2d at 1488. The *Rind* court refused to do so, explaining that while the private right of action at issue in *Lampf* was created by the courts and not by Congress, the SEC's "enforcement powers are a product of congressional design and not judicial imagination." *Id.* at 1490. *See also SEC v. O'Hagan,* 793 F.Supp. 218, 221 (D.Minn.1992) ("An SEC enforcement action is . . . express, not implied, regardless of whether judicial interpretation has broadened the rule which the SEC seeks to enforce."). This holding of the *Rind* decision has received particularly strong criticism. One commentator, Edward Brodsky, offered in a thoughtful discourse, "[*Rind's* ] assumption that Congress deliberately omitted a statute of limitations must be seen as a fiction. . . . Congress had no need to consider the statute of limitations applicable to the SEC when it enacted the securities laws, for the SEC's mandate did not include suing to punish alleged violators for past violations." Edward Brodsky, *Statute of Limitations and Civil Enforcement,* N.Y.L.J., Sept. 21, 1993, at 3, 6.

Although *Rind* is correct in stating that the Securities Act and the Exchange Act do expressly authorize SEC enforcement actions, it remains true that those statutes do not state that such actions can be based on *past* violations of the laws, as opposed to existing and prospective violations. Instead, courts permitted that enforcement activity based upon a finding that the actions "effectuate[d]" the statutes' purpose of deterring future violations. *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1104 (2d Cir.1972) ("The deterrent effect of an SEC enforcement action would be greatly undermined if securities laws violators were not required to disgorge . . . profits."). *See also SEC v.*

---

12. A limitation period of course makes no sense in the context of actions based on existing and prospective violations, because such actions, by definition, seek to remedy conduct that is currently occurring or has yet to occur, respectively.

*Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1308 (2d Cir.) ("It would severely defeat the purposes of the [Exchange Act] if a violator ... were allowed to retain the profits from his violation."), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 562, 30 L.Ed.2d 558 (1971). The argument that Congress as a result never had reason to consider imposing a limitation period, however, simplifies the manner in which courts have "authorized" enforcement actions concerning past violations. A more careful reading of the case law reveals that the holdings were simply the result of Congress having authorized the equitable remedy of injunctions for current and prospective violations. That proposition is supported by ample precedent. In enacting such a statute, the courts reasoned, Congress invoked all equitable powers of the courts, which includes disgorgement and injunctions based on past violations. *SEC v. Materia,* 745 F.2d 197, 200 (2d Cir.1984) (" 'When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes.' " (citations omitted) (quoting *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 291–92, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960))), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1103 (2d Cir.1972) ("Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy."); *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307 (2d Cir.) ("[T]he courts of appeals have upheld the equity power of the district courts to authorize as ancillary relief the appointment of receivers under the Securities Exchange Act of 1934 ... even though no specific statutory authority exists for such action ... [I]n other contexts the Supreme Court has upheld the power of the Government without specific statutory authority to seek restitution, and has upheld the lower courts in granting restitution, as an ancillary remedy in the exercise of the courts' general equity powers to afford complete relief." (citations omitted)), *cert. denied,* 404 U.S. 1005,

92 S.Ct. 561, 562, 30 L.Ed.2d 558 (1971); *see also J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964) ("It is for the federal courts 'to adjust their remedies so as to grant the necessary relief' where federally secured rights are invaded." (quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946))). Moreover, as the Second Circuit pointed out in *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 562, 30 L.Ed.2d 558 (1971), the Supreme Court, in *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 391, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970), held "[W]e cannot fairly infer from the Securities Exchange Act of 1934 a purpose to circumscribe the courts' power to grant appropriate remedies." Although *Mills* involved relief sought by private litigants, *Texas Gulf Sulphur* found the *Mills'* holding "fully applicable in enforcement actions by the SEC." *Texas Gulf Sulphur,* 446 F.2d at 1308 (citations omitted).

Thus, it can be argued that when Congress granted the SEC the authority to seek equitable relief, it was aware that injunctions and disgorgement based on past violations were remedies it was enabling the SEC to obtain. As a result, Congress' failure to provide a limitation period may reflect its desire that there be no limitation. Such an argument, standing alone, would fail because it constitutes an attempt to equate silence with explicit rejection of a limitation period. As noted above, where Congress has been silent, courts routinely "borrow" a limitation period from a different statute, (or a different provision of the same statute), rather than concluding that Congress desired no period. In addition, however, the SEC notes that when Congress passed the Insider Trading Sanctions Act of 1984, which authorized penalties and a limitation period for specified securities activity, 15 U.S.C. § 78u–1(d)(5) (1988), Congress "explicitly declined to extend application of the limitations period to [other] actions brought by the Commission." SEC Initial Memorandum at p. 11. The relevant portion of the Insider Trading Act states that it "shall not be construed to bar or limit in any manner any action by the Commission ... under any other provisions of this title."

*Id.* The SEC argues that, in so writing, Congress has exhibited its desire that the other actions authorized in that title, which include the enforcement actions at issue here, be free of a limitation period. This situation is analogous to that addressed by the Second Circuit in *Capozzi v. United States,* 980 F.2d 872, 875 (2d Cir.1992). There, the court stated that where Congress explicitly specified in four provisions of the Internal Revenue Code that no limitation period applied to the actions authorized by those provisions, the fact that Congress failed to so specify in the provision at issue constituted a "forceful" argument that Congress did not intend the actions authorized by that provision to be free of a limitation period.[13] In light of the time that had passed during which the SEC routinely obtained disgorgement based on past securities laws violations, Thomas L. Riesenberg, *Application of Statutes of Limitations to SEC Disgorgement Actions,* 8 No. 2 Insights 17 (P–H Feb. 1994) (stating that "disgorgement has become the rule rather than the exception in Commission enforcement actions"), and the fact that courts were consistently not holding the SEC to limitation periods in such actions, Congress' restriction of the above limitation period to insider trading activity warrants the finding that Congress desired to keep the SEC free from limitation periods in these actions.

a. *Limitation Period Inappropriate Where Government Is Pursuing A Public Right*

Even if I found that Congress had no such desire, and held instead that Congress had simply been silent on the matter, it would be incorrect in this situation to observe the regular practice of "borrowing" a limitation period. That practice is suspended, in accordance with the common law doctrine *nullum tempus occurrit regi* (time does not run against the king), *United States v. Thompson,* 98 U.S. 486, 489, 25 L.Ed. 194 (1879), where the government is pursuing a public right or interest. As stated by the Supreme Court in *E.I. Dupont De Nemours*

*& Co. v. Davis,* 264 U.S. 456, 462, 44 S.Ct. 364, 366, 68 L.Ed. 788 (1924) (citations omitted), where the Court refused a request to "borrow" a limitation period from a different part of the federal statute at issue, "An action on behalf of the United States in its governmental capacity ... is subject to no time limitation, in the absence of congressional enactment clearly imposing it." *See also United States v. Summerlin,* 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940) ("It is well settled that the United States is not bound by the state statutes of limitations or subject to the defense of laches in enforcing its rights."); *United States v. Beebe,* 127 U.S. 338, 344, 8 S.Ct. 1083, 1086, 32 L.Ed. 121 (1888) ("The principle that the United States are [sic] not bound by any statute of limitations ... in a suit brought by them as a sovereign government to enforce a public right, or assert a public interest, is established past all controversy or doubt." (citations omitted)); *Capozzi v. United States,* 980 F.2d 872, 875 (2d Cir.1992) ("[N]o statute of limitations will block federal government actions unless Congress clearly and specifically says so." (citations omitted)). The doctrine does not apply, however, when the government is functioning merely as a "conduit for the enforcement of private rights which could have been enforced by the private parties themselves." *Marshall v. Intermountain Elec. Co.,* 614 F.2d 260, 262 n. 3 (10th Cir.1980). Thus we must determine whether the government in cases such as this is truly pursuing a public right or interest.

The SEC contends that its "enforcement actions are brought ... to vindicate a public right." SEC Initial Memorandum at 8. The SEC can distinguish its enforcement actions from the lawsuits that private parties pursue by noting that SEC actions, pursuant to Congressional authorization, 15 U.S.C. §§ 77t(b), 78u(d), can seek not only money from parties but also injunctions that bar the parties from engaging in violations of the relevant securities laws. Seeking such injunctions, which are something that apparently benefits the

**13.** Indeed, the only reason the Second Circuit refrained from agreeing with the appellant was its adherence to the principle that actions brought by the United States cannot be subject to a limitation period without explicit imposition of

one by Congress. The application of that principle to the instant case is discussed in the following section, "Limitation Period Inappropriate Where Government Is Pursuing A Public Right."

public as a whole, arguably renders SEC suits ones that pursue vindication of a public right or interest. This difference, by itself, however, appears inadequate to support such a conclusion in light of the Supreme Court's decision in *Occidental Life Insurance Co. v. EEOC,* 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). There, the Court addressed the issue of whether a limitation period applied to a civil action brought by the EEOC against an employer, which action sought back pay for a discharged employee as well as an injunction prohibiting the employer from engaging in further violations of the Civil Rights Act of 1964. The Court did not find it necessary to consider that the EEOC might be free from a limitation period on the basis that it sought the injunction.[14] The dissent, however, after finding that the action was not one where the United States was suing to vindicate a public right because the EEOC sought backpay for a private party who could have brought her own action, emphasized that the simultaneous pursuit of the injunction did not alter its analysis. *Id.* at 383, 97 S.Ct. at 2463 (Rehnquist, J. dissenting). The dissent explained, "While injunctive relief may appear more 'broad based,' it nonetheless is redress for individuals. The United States gains nothing tangible as a result of the suit." *Id.*

Finding support in the *Occidental Life* dissent, litigants and legal commentators have contended that SEC actions seeking disgorgement do not constitute the pursuit of a public interest or right because the SEC regularly turns over the disgorged proceeds to the victims of the violations; as a result, they assert, SEC enforcement actions serve as simple substitutes of the Rule 10b–5 actions that the victims might otherwise bring and consequently vindicate the rights of those private victims and not the public as a whole. *E.g.,* SEC's Brief at 19, *Rind,* (No. 91–55972) (addressing Rind's argument) (*available in* William R. McLucas & Linda C. Quinn, Selected Judicial Developments, at 379 (PLI Corporate Law and Practice Course Handbook Series No. 768, Mar. 6–7, 1992)), Thomas L. Riesenberg, *Application of Statutes of Limitations to SEC Disgorgement Actions,* 8 No. 2 Insights 17 (P–H Feb. 1994). The SEC concedes that it often provides the defendants' disgorged proceeds to their victims, but counters by attempting to distinguish between SEC actions seeking disgorgement and private lawsuits praying for compensation, pointing out that "[d]isgorgement focuses not on the amount of injury suffered by the victim but on the amount of profit obtained by the wrongdoer." SEC's Brief at 3, *Rind* (No. 91–55972) (*available in* William R. McLucas & Linda C. Quinn, Selected Judicial Developments, at 363–64 (PLI Corporate Law and Practice Course Handbook Series No. 768, Mar. 6–7, 1992)). While it is true that the "amount of profit obtained by the wrongdoer" often differs from the "amount of injury suffered by the victim," the SEC's reliance on this difference is undermined in part by the Supreme Court decision of *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). There, the Court stated that in a private action for redress of securities law violations where the amount obtained by the wrongdoer exceeds the victim's injury, the measure of damages will be fixed at the higher amount. *Id.* at 155, 92 S.Ct. at 1473. Hence, in every such case, there no longer will be a disparity between the amount the wrongdoer would have to pay the SEC in a civil enforcement action as opposed

---

14. The Court, deciding that such actions are not subject to a limitation period, reasoned that a limitation period would conflict with Congressional intent in that Congress authorized the EEOC to pursue enforcement actions while aware that the EEOC was experiencing a large backlog of cases. *Occidental Life,* 432 U.S. at 369–71, 97 S.Ct. at 2456–57. Moreover, explained the Court, Congress' authorization requires that the EEOC first attempt informal resolution of disputes prior to bringing court actions, a requirement that necessarily delays the bringing of lawsuits. *Id.* at 369, 97 S.Ct. at 2456.

I do not find that factors similar to those detailed in *Occidental Life* exist vis-a-vis the Congressional grant of authority that enabled the SEC to pursue the civil enforcement actions at issue in this case. *Contra SEC v. Rind,* 991 F.2d 1486, 1492 (9th Cir.) (finding that *"Occidental* supports the conclusion that no statute of limitations should apply to Commission civil enforcement actions"), *cert. denied,* —— U.S. ——, 114 S.Ct. 439, 126 L.Ed.2d 372 (1993).

to an individual plaintiff who pursued a private action.[15]

Indeed, if it were true, as the SEC alleges, that in pursuing civil enforcement actions, it is not acting as a mere proxy for private parties, then it would seem that entities who have violated securities laws would be susceptible to both the disgorgement sought by the SEC in a civil enforcement action and the compensation sought by other parties in Rule 10b–5 actions. This, however, simply is not so. *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F.Supp. 1071, 1076 (S.D.N.Y.1990) ("[O]nce ill-gotten gains have been disgorged to the SEC, there remains ... no basis for further disgorgement in a private action."); *National Westminster Bancorp NJ v. Leone*, 702 F.Supp. 1132, 1140 (D.N.J.1988) ("[P]laintiff may not recover from defendants any profits already disgorged to SEC in the prior action...."); *SEC v. Penn Cent. Co.*, 425 F.Supp. 593, 599 (E.D.Pa.1976) ("To the extent that defendants have made restitution [to the victims], the amounts paid would serve to offset part or all of a[n] [SEC] judgment for disgorgement.").

The SEC's position appears to be further vitiated by the fact that not only does the SEC, as a matter of practice, turn over disgorged proceeds to the victims of the given violation, but in several proceedings, courts have actually required that the victims receive the disgorged proceeds. *SEC v. Blatt*, 583 F.2d 1325, 1335 n. 30 (5th Cir.1978) (discussing how the district court appointed a trustee to distribute the disgorged funds to the victims); *SEC v. Blavin*, 557 F.Supp. 1304, 1316 (E.D.Mich.1983) (directing the SEC to "prepare a plan for the disposition of funds ordered disgorged [, which] plan should provide, wherever possible, for restitution of these funds to persons who lost money at [defendant's] hands"), *aff'd*, 760 F.2d 706 (6th Cir.1985); *SEC v. Manor Nursing Centers, Inc.*, 340 F.Supp. 913, 936 (S.D.N.Y.1971), *aff'd*, 458 F.2d 1082 (2d Cir.

1972) (appointing a receiver and ordering that the disgorged proceeds be distributed to the victims). Notwithstanding what appears to be the practical equivalence of SEC actions and those that private parties can bring, the SEC's position finds great support in the fact that its statutory authorization to bring civil enforcement actions does not require it to turn disgorged proceeds over to the private investors who have been damaged by the violator's activity; rather, disgorged proceeds can very well end up in the United States Treasury, for example, (1) where numerous victims suffered relatively small amounts thereby making distribution of the disgorged proceeds to them impractical, *e.g.*, SEC's Brief at 21, *Rind* (No. 91–55972) (*available in* William R. Lucas & Linda C. Quinn, Selected Judicial Developments, at 381 (PLI Corporate Law and Practice Course Handbook Series No. 768, Mar. 6–7, 1992)); (2) where the victims cannot be identified, *see e.g.*, *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir.1985) (stating that funds remaining after "identifiable private parties" have been compensated "shall revert to the United States Treasury"), *aff'g* 557 F.Supp. 1304 (E.D.Mich.1983); and (3) where there are no victims entitled to damages, *see e.g.*, *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C.Cir.1994) ("Whether or not [defendant's] securities violations injured others is irrelevant to the question whether disgorgement is appropriate."), *aff'g* 814 F.Supp. 116 (D.D.C.1993); *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) (approving of disgorgement "[w]hether or not any investors may be entitled to money damages"), *cert. denied*, 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). In this way, the SEC's actions differ from actions brought by the EEOC, discussed in *Occidental Life*, where the back pay sought against an employer, must, by statutory definition, be turned over to the individual who of course could have brought a private action. This difference persists despite the fact that the SEC's authorization does not go so far as

---

**15.** In an early case on disgorgement, the Second Circuit also attenuated the distinction between these two concepts when, while ruling that securities law violators did not have to disgorge the profits they had earned on the wrongfully obtained proceeds, it considered "significant" (but

"not conclusive") that the victims of the wrongdoers would not have been permitted to recover those profits in a private enforcement action. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir.1972).

to prohibit it from so distributing disgorged proceeds. As a result, unlike the situation described by the dissent in *Occidental Life,* the United States is not precluded from gaining something "tangible" as a result of the type of SEC suits at issue here.

I therefore find that the SEC action at issue here operates to vindicate a public interest and, accordingly, that it is improper to "borrow" a limitation period. The element of SEC actions that I find dispositive in terming them public interest actions is their allowance for the United States to itself obtain a monetary benefit.[16] The fact that SEC actions often benefit private parties does not persuade me that they cannot simultaneously serve the public interest. *See also* Comment, Christopher R. Dollase, *The Appeal of* Rind: *Limitations of Actions in Securities and Exchange Commission Civil Enforcement Actions,* 49 Bus.Law. 1793, 1814 (1994) ("There does not need to be a complete demarcation between public interest and benefits to individuals."). Several cases have recognized, in other contexts, the dual benefit that SEC actions create. *SEC v. Tome,* 833 F.2d 1086, 1096 (2d Cir.1987) ("The *paramount purpose* of ... disgorgement is to make sure that wrongdoers will not profit from their wrongdoing." (emphasis added)), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988); *SEC v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 102 (2d Cir.1978) ("[T]he *primary purpose* of disgorgement is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched." (emphasis added)); *cf. SEC v. Penn Cent. Co.,* 425 F.Supp. 593, 599 (E.D.Pa.1976) ("The fact that *one consequence* of the action may be to benefit private parties does not detract from the public purpose of effectuating the goals of the securities laws." (emphasis added)).

Because I find the SEC enforcement action at issue in this case free from a limitation period, I grant the SEC's motion to strike defendants' affirmative defense that asserts a limitation period.

III.  *Conclusion*

The SEC's motion to voluntarily dismiss the following claims against Laff with prejudice is granted: the Third and Sixth causes of action, in their entirety, and the First, Second, Fourth and Seventh causes of action as far as these claims relate to all transactions in Big O Tires, Inc., Cliff Engle Ltd., Digital Metcom, Inc., Fountain Powerboat Industries, Inc. and Tunex International, Inc., to transactions in Flores de New Mexico, Inc. prior to August 27, 1986, and to transactions in TS Industries, Inc. prior to July 1, 1987; and

The SEC's motion to strike defendants' affirmative defense asserting a limitation period is granted.

**SO ORDERED**

---

**16.** Consequently, it is unnecessary to consider the position of the dissent in *Occidental Life,* which stated that merely seeking to enjoin a party from engaging in activity that would harm the public as a whole, but not the United States Treasury directly, does not render an action one brought to vindicate a public right or interest.